**DYNAMICS CORPORATION OF AMERICA (formerly Claude Neon, Inc.)**

**v.**

**The UNITED STATES.**

**No. 338–65.**

United States Court of Claims.
March 15, 1968.

242

David E. Wasserstrom, Washington, D. C., attorney of record, for plaintiff. Goodwin, Rosenbaum, Meacham & White, Washington, D. C., of counsel.

Mildred L. Seidman, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This is a suit for refund of 1953 corporate income taxes based on a loss carryback from 1954. The facts are as stipulated, and, since there is no dispute between the parties concerning them, the only issues to be resolved are legal questions raised by cross-motions for summary judgment. The plaintiff, Dynamics Corporation of America, is a successor through merger to Claude Neon, Inc. (hereafter Neon).

After plaintiff filed its claim for refund, the Commissioner of Internal Revenue Service conducted an audit of Neon's 1953 tax return and concluded that certain payments received in that year and not theretofore considered in computing the 1953 tax had been improperly omitted. The effect of this determination and recomputation was to increase taxpayer's 1953 income and, at the same time, reduce the 1954 carryback, the net result of all of which was to completely offset plaintiff's claim for refund. Specifically, the Commissioner concluded that certain payments made by a subsidiary corporation, Reeves-Ely Laboratories, Inc. (hereafter Reeves-Ely), to its parent, Neon, pursuant to an agreement under which Neon filed a consolidated tax return were to be regarded as dividends and therefore taxable in the year received, 1953.

Defendant asks us to sustain the Commissioner's determination. Plaintiff, on the other hand, argues that these payments represent income other than dividends, but that, in any event, under its accrual method of accounting, these payments are to be computed as part of its 1952 taxable income. If plaintiff is correct in its contention, its carryback to 1953 would be unimpaired and it would be entitled to refund. We conclude, however, that the payment was a dividend and taxable in 1953. We also hold that in computing the net operating loss deduction for 1953, the 85 percent dividend received credit from the payments in issue is available to offset the 1954 carryback loss. These determinations are dispositive of the case.

The nature of the payments can be understood from the following: During the years 1950 through 1952, Neon was the parent of an affiliated group of corporations as that term is defined in Section 141 of the 1939 Internal Revenue Code (26 U.S.C. § 141(d) (1952)). The affiliated group included Neon's three wholly owned subsidiaries, a 99.24 percent controlled subsidiary, Reeves-Ely, and Reeves-Ely's six wholly owned subsidiaries. All of these corporations used an accrual method of accounting.

A December 29, 1950 agreement provided that Neon and Reeves-Ely would file consolidated Federal tax returns whenever a consolidated filing was required, or whenever such a filing reduced the tax liability for the entire group below what would be the aggregate liability if each corporation filed separately. The agreement provided that Reeves-Ely would pay to Neon, as the former's "constructive tax liability", an amount equal to Reeves-Ely's minimum tax liability. Further, it was agreed that if Neon's actual consolidated tax liability for a taxable period was reduced by the Inclusion of Reeves-Ely and the latter's subsidiaries in a consolidated return, Neon would pay to Reeves-Ely as a capital contribution an amount equal to the reduction in tax liability resulting from the consolidated filing.

It is important to note that Section 141 of the 1939 Internal Revenue Code permitted the filing of consolidated returns only so long as a parent held 95 percent or more control of the subsidiary to be included in the consolidated return. Pursuant to the agreement, Neon filed a consolidated return which included Reeves-Ely and its subsidiaries for 1950, 1951, and part of 1952. After October 23, 1952, Reeves-Ely and its subsidiaries were no longer eligible for inclusion in the consolidated return of Neon, because on that date, as a result of the conversion of some of Reeves-Ely's preferred stock to common stock, Neon's holdings of Reeves-Ely stock fell to something just below the required 95 percent.

Customarily, Reeves-Ely made its constructive tax payments to Neon sometime after the period for which the taxes were due. Specifically, its constructive tax liability for 1950 was paid to Neon in part in 1950 and the remainder in 1951, and payment for its 1951 tax liability was made to Neon in 1952. Similarly, between March 13, 1953 and December 16, 1953, Reeves-Ely paid to Neon a total of $2,561,015 as its constructive tax liability for 1952. This amount was paid

with the understanding of both companies that the December 29, 1950 agreement was valid and binding, and that there would be no restriction on Neon's use of any part of the payments. No part of the payment was made available to Neon prior to 1953. The Commissioner determined that the taxes allocable to Reeves-Ely and its subsidiaries for the year 1952 were only $1,680,614.30. Therefore, Neon received, in 1953, a total of $880,400.70 from Reeves-Ely in excess of the latter's tax liability. The Commissioner treated this excess amount as a dividend received in 1953, and we sustain that determination.

The effect of characterizing the $880,-400.70 payment as a dividend received in 1953 was, of course, to require a recomputation of Neon's 1953 tax liability, for that amount had not earlier been considered in computing taxpayer's liability. After audit and despite consideration of the 1954 carryback loss, the Commissioner found that there remained a deficiency of $78,628.90; however, this deficiency cannot now be assessed because of the running of the statute of limitations.

I

Plaintiff has been steadfast in its contention, urged in pleadings and orally before this court, that the payments in issue were not dividends. However, plaintiff has presented no persuasive support for its argument and has failed to direct us to any section of the Internal Revenue Code or to any case law which shows that the payments should be treated other than as dividends.

The parties have stipulated that the payments in issue were made in 1953 and also that Reeves-Ely had on hand as of December 31, 1953, earnings and profits at least equal to the amount which the Commissioner has determined to be paid as dividends. We find, therefore, that those payments made by Reeves-Ely to Neon which were in excess of the former's allocable share of the consolidated tax liability constituted dividend distributions within the meaning of the 1939 Internal Revenue Code.

Section 115 of that Code defined a dividend as:

(a) * * * *any* distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year) without regard to the amount of the earnings and profits at the time the distribution was made * * *. (26 U.S.C. § 115(a) (1952)). [Emphasis added.]

It is important to note also that subsection (b) of section 115 provided, in pertinent part, that:

(b) Source of Distributions.—For the purposes of this chapter *every* distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings and profits * * *. (26 U.S.C. § 115(b) (1952)). [Emphasis added.]

 We call attention to the italicized words "any" and "every" in the subsections (a) and (b) above and interpret those provisions, taken together, to mean that a distribution is presumed to be made out of earnings and profits and, to the extent thereof, constitutes a dividend, unless the distribution is specifically covered by some other section of the code. Adapting the language of subsection (a), therefore, we have here a distribution in the form of an excessive payment for constructive tax liability, made by a corporation, Reeves-Ely, to its shareholder, Neon, out of earnings and profits. Plaintiff has failed to call our attention to any other section of the code which would better apply to the payments, and we have found no other. We are satisfied that the payments constituted a dividend.

 Parenthetically, it will be recalled that at the time Neon received the payments in 1953, it owned less than 95 percent of the outstanding Reeves-Ely common stock. However, the fact that Neon

was the only shareholder to receive the payments now in issue does not deprive the payments of their classification as dividends. It is not necessary that a dividend be paid to all shareholders. Lincoln Nat'l Bank v. Burnet, 61 App. D.C. 354, 63 F.2d 131, 133 (1933).

We note that the case of Beneficial Corp. v. Comm'r, 18 T.C. 396 (1952), aff'd per curiam, 202 F.2d 150 (3d Cir. 1953), involved a question identical to the one we face here, to wit, in the language of the Tax Court, "whether amounts paid to petitioner in [1946] by its subsidiary corporations with whom it filed a consolidated return for 1945 constituted taxable dividends to the extent that they exceeded the tax liabilities properly allocable to the subsidiaries in the consolidated return." (18 T.C. at 397).

The taxpayer in *Beneficial* for the year 1945 filed a consolidated income and excess tax return in which it listed the operations of itself and five immediate subsidiaries. Each subsidiary consented to the filing of the consolidated tax return by adopting, in 1944, a corporate resolution which authorized its officers to file such a return and which authorized the treasurer to remit to the parent corporation an amount equal to what would be the subsidiary's individual tax liability were it filing a separate return. Just as in our case, payments to the parent for constructive tax liability were made wholly in the year following that for which the taxes were due; each subsidiary had accumulated earnings and profits at least equal to the amount which the Commissioner determined to be a dividend; and both parent and subsidiaries were on the accrual method of accounting.

Taxpayer in *Beneficial* argued that the payments were actually made pursuant to an agreement and that therefore they were really "debt obligations" rather than dividends. The court reasoned that the payments were properly to be regarded as dividends and that the "debt obligation" argument was without merit. The decision first quoted from the definition of a dividend contained in Section 115(a) of the Internal Revenue Code of 1939, supra, and then continued:

This definition is obviously broad enough to cover the payments in dispute. Even if the payments had been made in discharge of a binding contractual obligation on the part of the subsidiaries, which the evidence fails to show, we think, this could not prevent them from being dividends. Dividends are often paid pursuant to enforceable contractual obligations. Under the statute they are nevertheless dividends if they are distributions out of accumulated surplus or current earnings. The distribution by a subsidiary corporation of its allocable portion of the tax due on a consolidated return would, of course, not be called a "distribution" to the parent company nor does the respondent so contend. His determination is that only the excess of the payments which the subsidiaries made to the parent company over the portion of the taxes due on the consolidated return properly allocable to them was a dividend distribution. We can see no error in this determination. Certainly, the payments to that extent were not for any benefits received by the subsidiaries. (18 T.C. at 399)

We fully concur with the decision in *Beneficial*, for we feel that excessive constructive tax payments of this nature clearly fall within the legislative definition of a dividend. Further, we fail to see why an agreement or contract to make such payments in any way alters their character as dividends, although plaintiff has attemped to distinguish *Beneficial* on the ground that the payments there in issue were not made under a contractual obligation as they were in the case now before us. In answer to the taxpayer's argument in *Beneficial* that payments had been made under a binding obligation, the Tax Court stated that "even if" a contract had been involved it would nonetheless have concluded that a dividend had been paid. Plaintiff is perhaps correct in pointing out

that *Beneficial's* announcement on this point is *dictum* inasmuch as that court found that the evidence did not suggest the presence of a contract;[1] however, we would note the reasoned attention which the *Beneficial* court gave to the problem whether payments pursuant to a contract would affect its decision. Also, we emphasize that for reasons quite apart from the precedential effect of the *Beneficial* decision, we would independently conclude that the presence of this contract in no way affects the character of the payment as a dividend.

■ The only effect the contract had on Reeves-Ely was to *obligate* it to make payments for its constructive tax liability. Parenthetically, as a technical matter, the amount in excess of its actual tax liability need not have been paid and was therefore a voluntary distribution; however, we will assume for the purposes of this discussion that Reeves-Ely had an obligation to pay the full $880,-400.70. In our view, whether a distribution is a dividend or a payment of some other kind depends only on the economics of the situation; in skeletal form Section 115(a) of the Internal Revenue Code of 1939 simply provided that a dividend is " * * * any distribution made by a corporation to its shareholders * * * out of earnings or profits * * *." That section does not except or exclude distributions made pursuant to a contract. Clearly, then, the existence of a contract with a stockholder requiring a payment does not necessarily make that payment other than a dividend. Interstate Transit Lines, Inc. v. Commissioner of Internal Revenue, 44 B.T.A. 994, 998 (1941), acquiesced in 1941–2 Cum.Bull. 7. Commonly, corporations bind themselves to pay dividends on preferred stock and occasionally on common stock. Similarly, it is clear that under certain circumstances an equity court will compel the payment of dividends. Knapp v.

Bankers Securities Corp., 230 F.2d 717, 720 (3d Cir. 1956). Often, too, corporations make payments under contractual obligations and the payments are later given dividend effect. For example, courts have often found a dividend distribution when a shareholder-officer has received excessive compensation, or when a corporation has, under contract, loaned money to a stockholder and later cancelled the indebtedness. In none of these situations has the fact that the payment has been made under an obligation been held to preclude its treatment as a dividend.

Finally, plaintiff contends that the payments were not "intended" to be dividend distributions and that therefore they are ineligible for dividend treatment.

■■ We do not agree. If a distribution meets the requirements of the statutory definition of a dividend, then it is regarded as such notwithstanding the fact that it was intended to be a payment of some other kind. Christopher v. Burnet, 60 App.D.C. 365, 55 F.2d 527, 528 (1931); Hadley v. Commissioner of Internal Revenue, 59 App.D.C. 139, 36 F.2d 543, 544 (1929). It is not necessary that the dividend be formally declared, or that the payment be termed a dividend, or that the payment be made to all the shareholders. Lengsfield v. Commissioner of Internal Revenue, 241 F.2d 508, 511 (5th Cir. 1957); Regensburg v. Commissioner of Internal Revenue, 144 F.2d 41, 44 (2d Cir.), cert. denied, 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944). For example, distributions have been regarded as dividends where a corporation makes a loan to a shareholder and later cancels the indebtedness, or sells property to a shareholder for a purchase price far below its fair market value, or pays compensation to an officer-shareholder in an amount in excess of the value of his services. In cases such as these and

---

1. We give the plaintiff the benefit of the doubt in calling *Beneficial's* discussion of the contract matter *dictum*. Actually, it would seem to be more of an alternative ruling. The court felt that there was not enough evidence to support the presence of a contract, but it was not certain; for that reason it added the words "we think," and then continued with an "even if" ruling.

others involving the same problem, courts have had little difficulty in holding the distribution, or that part of it in excess of the *quid pro quo,* to be a dividend, notwithstanding the fact that neither the shareholder nor the corporation "intended" that a dividend be paid. It is not the intent of the parties that governs the characterization of the distribution, but rather the economic and consequent legal effect of their actions.

The case of Lincoln Nat'l Bank v. Burnet, 61 App.D.C. 354, 63 F.2d 131 (1933) summed up the law on this point nicely:

> It is true that the directors considered it in part as a gift and not as a dividend, but this is not determinative of the nature of the distribution, nor is the fact that the distribution was to some of the shareholders only and not to others, nor that it was divided among the stockholders in proportions other than their respective holdings of stock in the corporation * * *. The character of the distribution as a division of profits was not changed by the manner in which it was accomplished, nor by the personal motives which induced the respective stockholders or directors to approve of such action, for it nevertheless remained in contemplation of law a distribution of dividends. (63 F.2d at 133).

## II

Plaintiff contends that even if the payments are regarded as dividends, since Neon was on the accrual method of accounting, the dividends must be regarded as being received, for tax purposes, in 1952. It is in that year, plaintiff reasons, that all the events giving rise to the payments occurred and the right to the payments became fixed. It follows from this treatment, taxpayer would have us conclude, that the dividend payments would not be available to offset the 1954 carryback loss in 1953, and Neon would be entitled to a refund on its 1953 income taxes.

█ Fatal to plaintiff's argument is its failure to recognize the unique treatment given dividend distributions by the income tax laws. Generally a taxpayer on the accrual method of accounting may include items in his gross income when the right to receive them becomes fixed; however, the tax treatment is otherwise for dividend distributions. Section 115 (a) of the 1939 Internal Revenue Code provided, in part, that, "The term 'dividend' * * * means any *distribution* made by a corporation to its shareholders * * *" [Emphasis Added], and Treasury Regulation 111, section 29.-115–1 under the 1939 Code provided that:

> A taxable distribution made by a corporation to its shareholders shall be included in the gross income of the distributees when the cash or other property is *unqualifiedly made subject to their demands.* [Emphasis added.]

Neither the statute nor the regulation made any distinction between cash basis and accrual method taxpayers, and the courts have pointed out that, in determining when a dividend distribution is to be included in gross income, all taxpayers are to be treated the same regardless of their method of accounting. Commissioner of Internal Revenue v. American Light & Traction Co., 156 F.2d 398, 400, 167 A.L.R. 300 (7th Cir. 1946); Tar Products Corp. v. Commissioner of Internal Revenue, 130 F.2d 866, 143 A.L.R. 593 (3d Cir. 1942).

█ Emphasizing the italicized words in the statute and regulation, courts have held that something more than the mere accrual of a right to receive a dividend must occur before it can be included in the gross income of the distributee. The cases have generally taken one of two positions in holding that the dividend may be included in the gross income of the distributee either (1) at the time the corporation is willing and able to pay the dividend, Newmark v. Commissioner of Internal Revenue, 311 F.2d 913, 915 (2d Cir. 1962); Brundage v. United States, 275 F.2d 424, 427 (7th Cir. 1960); Aramo-Stiftung v. Commissioner of Internal Revenue, 172 F.2d 896, 897 (2d Cir. 1949), or (2) at the time there is

actual receipt of the dividend, Commissioner of Internal Revenue v. American Light & Traction Co., supra; Tar Products Corp. v. Commissioner of Internal Revenue, supra; Beneficial Corp. v. Commissioner of Internal Revenue, 202 F.2d 150 (3d Cir. 1953), aff'g, 18 T.C. 396 (1952); Frelbro Corp. v. Commissioner of Internal Revenue, 36 T.C. 864, 871–872 (1961).

In Denver & Rio Grande Western R.R. Co. v. United States, 318 F.2d 922, 162 Ct.Cl. 1 (1963), this court held that the time of actual receipt of the dividend governed its inclusion in taxable income (318 F.2d at 924–925, 162 Ct.Cl. at 5), and we adhere to that ruling as controlling under the facts of this case. However, we note that even if we adopted the "willing and able" standard, defendant would still prevail, for the parties expressly stipulated that no part of the entire constructive tax liability payment "was made available to Neon prior to 1953." (Stipulation 22). Clearly then, in no event was the dividend in issue "unqualifiedly made subject to [the] demands" of Neon in 1952. We conclude that the Commissioner was correct in including the dividend in Neon's 1953 tax return.

### III

It is defendant's contention, and we agree, that one direct effect of treating the $880,400.70 payment as a dividend is to permit the Commissioner, under the provisions of the Internal Revenue Code applicable in 1953, to apply an 85 percent dividend received credit in direct offset against the 1954 carryback loss. The effect of allowing this offset is to eliminate the 1954 carryback loss, the only ground on which claim for refund rests.

Section 26 of the 1939 Internal Revenue Code provided for the dividend credit, and read, in pertinent part, as follows:

Credits of corporations.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \*

(b) Dividends Received.—An amount equal to the sum of—

(1) In general.—85 per centum of the amount received as dividends \* \* \* from a domestic corporation which is subject to taxation under this chapter. (26 U.S.C. § 26(b) (1952)).

Although section 26 provided for an 85 percent dividend received credit, the effect of Section 122(c) of the 1939 Code was to require that the 85 percent credit be applied in reduction of any carryback loss. Section 122(c) provided, in pertinent part, as follows:

(c) Amount of net operating loss deduction.—The amount of the net operating loss deduction shall be the aggregate of the net operating loss carry-overs and of the net operating loss carry-backs to the taxable year reduced by the amount, if any, by which the net income \* \* \* \* exceeds, \* \* in the case of a corporation, the normal-tax net income \* \* \*. (26 U.S.C. § 122(c) (1952))

Section 13 of the 1939 Code made clear that the "net income" was the value of the income *including* the full value of the dividend (i. e., including the value of the dividend received credit), and the "normal-tax income" was the value of the net income less specified credits, including the dividend received credit. Section 13 provided, in pertinent part, as follows:

(a) Definitions.—For the purposes of this chapter—

(1) Adjusted net income.—The term "adjusted net income" means the net income minus the credit provided in section 26(a), relating to interest on certain obligations of the United States and Government corporations.

(2) Normal-tax net income.—The term "normal-tax net income" means the adjusted net income

minus the sum of the following credits:

(A) The credit for dividends received provided in section 26(b);

\* \* \* \* \* \*

(26 U.S.C. § 13(a) (1952).

Therefore, to reduce a carryback loss by an amount which represented the difference between the net income and the normal-tax income required that the carryback loss be reduced by at least the amount of the dividend received credit.

██ Plaintiff urges that the carryback loss can be offset only by the dividend received credit actually employed in originally computing the taxes paid for 1953. Since the $880,400.70 here in issue was not considered in the original computation of 1953 taxes filed with the Internal Revenue Service, plaintiff would have us ignore the dividend received credit for the purposes of determining the net operating loss deduction.

Plaintiff fails to cite any authority in support of its argument, and we think the contention is without merit. It is clear that, although the statute of limitations may act to effectively bar the Commissioner from assessing a deficiency for a past year, it does not prohibit him from correctly recomputing tax liability for that year and using his corrected figures to offset a timely refund claim. Springfield Street Ry. Co. v. United States, 312 F.2d 754, 160 Ct.Cl. 111, 115–116, (1963); Phoenix Coal Co. v. Commissioner of Internal Revenue, 231 F.2d 420, 421–422 (2d Cir. 1956); Commissioner of Internal Revenue v. Van Bergh, 209 F.2d 23, 25 (2d Cir. 1954); Rev.Rul. 56–285, 1956–1 Cum.Bull. 134.

### IV

At oral argument, plaintiff for the first time before this court took issue with the Government's computations and contended that if we concluded that a dividend was paid in 1953, the value thereof was not $880,400.70 but $1,784,-000. We note that in either event the defendant will prevail in this action for a $1,784,000 dividend payment would ob-

viously also offset the 1953 carryback loss and create an even greater deficiency, albeit an unassessable one. Thus, a determination of the exact amount of the dividend is not an issue which is necessary to the disposition of this case. It is enough that we here find that whether the dividend be $880,400.70 or $1,784,000, or some figure in between, plaintiff's claim for refund still must fail.

For the reasons stated above, plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted; and plaintiff's petition is dismissed.